PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-4097
_____

UNITED STATES OF AMERICA,
<u>Appellant</u>
v.

DENTSPLY INTERNATIONAL, INC.,

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE
(D.C. Civ. No. 99-00005)
District Judge:  Honorable Sue L. Robinson, Chief Judge

_____

Argued September 21, 2004
Before: McKEE, ROSENN and WEIS, <u>Circuit</u> <u>Judges</u>.

(Filed February 24, 2005)
_____

R. Hewitt Pate, Esquire
 Assistant Attorney General
Makan Delrahim, Esquire

J. Bruce McDonald, Esquire
  Deputy Assistant Attorneys General
Adam D. Hirsh, Esquire (ARGUED)
Robert B. Nicholson, Esquire
Mark J. Botti, Esquire
Jon B. Jacobs, Esquire
  Attorneys
U.S. Department of Justice
Antitrust Division
601 D Street NW, Room 10535
Washington, DC 20530-0001

Attorneys for Appellant United States of America

Margaret M. Zwisler, Esquire (ARGUED)
Richard A. Ripley, Esquire
Kelly A. Clement, Esquire
Eric J. McCarthy, Esquire
Douglas S. Morrin, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

William D. Johnston, Esquire
Christian D. Wright, Esquire
Young, Conaway, Stargatt & Taylor
1000 West Street
17th Floor Brandywine Building
Wilmington, Delaware 19801

Of Counsel:
Brian M. Addison, Esquire
Dentsply International, Inc.
Susquehanna Commerce Center
221 West Philadelphia Street
York, Pennsylvania 17405

Attorneys for Appellee Dentsply International, Inc.

———————

OPINION

———————

WEIS, Circuit Judge.

      In this antitrust case we conclude that an exclusivity policy imposed by a manufacturer on its dealers violates Section 2 of the Sherman Act. We come to that position because of the nature of the relevant market and the established effectiveness of the restraint despite the lack of long term contracts between the manufacturer and its dealers. Accordingly, we will reverse the judgment of the District Court in favor of the defendant and remand with directions to grant the Government's request for injunctive relief.

      The Government alleged that Defendant, Dentsply International, Inc., acted unlawfully to maintain a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; entered into illegal restrictive dealing agreements prohibited by Section 3 of the Clayton Act, 15 U.S.C. § 14; and used unlawful

3

agreements in restraint of interstate trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  After a bench trial, the District Court denied the injunctive relief sought by the Government and entered judgment for defendant.

In its comprehensive opinion, the District Court found the following facts.  Dentsply International, Inc. is a Delaware Corporation with its principal place of business in York Pennsylvania. It manufactures artificial teeth for use in dentures and other restorative appliances and sells them to dental products dealers.  The dealers, in turn, supply the teeth and various other materials to dental laboratories, which fabricate dentures for sale to dentists.

The relevant market is the sale of prefabricated artificial teeth in the United States.

Because of advances in dental medicine, artificial tooth manufacturing is marked by a low or no-growth potential. Dentsply has long dominated the industry consisting of 12-13 manufacturers and enjoys a 75% - 80% market share on a revenue basis, 67% on a unit basis, and is about 15 times larger than its next closest competitor.   The other significant manufacturers and their market shares are:

| | | |
|---|---|---|
| Ivoclar Vivadent, Inc. | 5% | |
| Vita Zahnfabrik | 3% | |
| *Myerson LLC | 3% | |
| *American Tooth Industries | | 2% |
| *Universal Dental Company | | 1% - 2% |
| Heraeus Kulzer GmbH | 1% | |
| Davis, Schottlander & Davis, Ltd. | <1% | |

*   These companies sell directly to dental laboratories as well as to dealers.

Dealers sell to dental laboratories a full range of metals, porcelains, acrylics, waxes, and other materials required to fabricate fixed or removal restorations. Dealers maintain large inventories of artificial teeth and carry thousands of products, other than teeth, made by hundreds of different manufacturers. Dentsply supplies $400 million of products other than teeth to its network of 23 dealers.

There are hundreds of dealers who compete on the basis of price and service among themselves, as well as with manufacturers who sell directly to laboratories. The dealer field has experienced significant consolidation with several large national and regional firms emerging.

For more than fifteen years, Dentsply has operated under a policy that discouraged its dealers from adding competitors' teeth to their lines of products. In 1993, Dentsply adopted

"Dealer Criterion 6." It provides that in order to effectively promote Dentsply-York products, authorized dealers "may not add further tooth lines to their product offering." Dentsply operates on a purchase order basis with its distributors and, therefore, the relationship is essentially terminable at will. Dealer Criterion 6 was enforced against dealers with the exception of those who had carried competing products before 1993 and were "grandfathered" for sales of those products. Dentsply rebuffed attempts by those particular distributors to expand their lines of competing products beyond the grandfathered ones.

Dentsply's five top dealers sell competing grandfathered brands of teeth. In 2001, their share of Dentsply's overall sales were

| Zahn | 39% | |
|------|-----|----|
| Patterson | 28% | |
| Darby | 8% | |
| Benco | | 4% |
| DLDS | <4% | |
| TOTAL .... | 83% | |

16,000 dental laboratories fabricate restorations and a subset of 7,000 provide dentures. The laboratories compete with each other on the basis of price and service. Patients and dentists value fast service, particularly in the case of lost or damaged dentures. When laboratories' inventories cannot

6

supply the necessary teeth, dealers may fill orders for walk-ins or use over-night express mail as does Dentsply, which dropped-shipped some 60% of orders from dealers.

Dealers have been dissatisfied with Dealer Criterion 6, but, at least in the recent past, none of them have given up the popular Dentsply teeth to take on a competitive line. Dentsply at one time considered selling directly to the laboratories, but abandoned the concept because of fear that dealers would retaliate by refusing to buy its other dental products.

In the 1990's Dentsply implemented aggressive sales campaigns, including efforts to promote its teeth in dental schools, providing rebates for laboratories' increased usage, and deploying a sales force dedicated to teeth, rather than the entire product mix. Its chief competitors did not as actively promote their products. Foreign manufacturers were slow to alter their designs to cope with American preferences, and, in at least one instance, pursued sales of porcelain products rather than plastic teeth.

Dentsply has had a reputation for aggressive price increases in the market and has created a high price umbrella. Its artificial tooth business is characterized as a "cash cow" whose profits are diverted to other operations of the company. A report in 1996 stated its profits from teeth since 1990 had increased 32% from $16.8 million to $22.2 million.

The District Court found that Dentsply's business justification for Dealer Criterion 6 was pretextual and designed expressly to exclude its rivals from access to dealers. The Court

7

however concluded that other dealers were available and direct sales to laboratories was a viable method of doing business. Moreover, it concluded that Dentsply had not created a market with supra competitive pricing, dealers were free to leave the network at any time, and the Government failed to prove that Dentsply's actions "have been or could be successful in preventing 'new or potential competitors from gaining a foothold in the market.'" United States v. Dentsply Int'l, Inc., 277 F. Supp. 2d 387, 453 (D. Del. 2003) (quoting LePage's, Inc. v. 3M, 324 F.3d 141, 159 (3d Cir. 2003)).  Accordingly, the Court concluded that the Government had failed to establish violations of Section 3 of the Clayton Act and Sections 1 or 2 of the Sherman Act.

The Government appealed, contending that a monopolist that prevents rivals from distributing through established dealers has maintained its monopoly by acting with predatory intent and violates Section 2.  Additionally, the Government asserts that the maintenance of a 75% - 80% market share, establishment of a price umbrella, repeated aggressive price increases and exclusion of competitors from a major source of distribution, show that Dentsply possesses monopoly power, despite the fact that rivals are not entirely excluded from the market and some of their prices are higher.  The Government did not appeal the rulings under Section 1 of the Sherman Act or Section 3 of the Clayton Act.

Dentsply argues that rivals had obtained a share of the relevant market, that there are no artificially high prices and that competitors have access to all laboratories through existing or readily convertible systems.  In addition, Dentsply asserts that its

success is due to its leadership in promotion and marketing and not the imposition of Dealer Criterion 6.

## I.  STANDARD OF REVIEW

We exercise *de novo* review over the District Court's conclusions of law.  See Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194, 201 (3d Cir. 1994).  See also United States v. Microsoft, 253 F.3d 34, 50 (D.C. Cir. 2001).  However, we will not disturb its findings of fact unless they are clearly erroneous.  See Smith-Kline Corp. v. Eli Lilly and Co., 575 F.2d 1056, 1062 (3d Cir. 1978).

## II.  APPLICABLE LEGAL PRINCIPLES

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties.  In addition, the Government may seek injunctive relief.  15 U.S.C. § 4.

A violation of Section 2 consists of two elements: (1) possession of monopoly power and (2) ". . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  Eastman Kodak Co. v Image Technical Servs., Inc., 504 U.S. 451, 480 (1992) (citing United States v. Grinnell Corp., 384 U.S. 563, 571 (1966)).  "Monopoly power under § 2 requires . . . something greater than market power under § 1."  Eastman Kodak Co., 504 U.S. at 481.

9

To run afoul of Section 2, a defendant must be guilty of illegal conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor." Id. at 482-83 (quoting United States v. Griffith, 334 U.S. 100, 107 (1948)). See generally Lorain Journal Co. v. United States, 342 U.S. 143 (1951). Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist. As we said in LePage's, Inc. v. 3M, 324 F.3d 141, 151-52 (3d Cir. 2003), "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." 3 Areeda & Turner, Antitrust Law ¶ 813, at 300-02 (1978).

Although not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly. United States v. Grinnell Corp., 384 U.S. 563 (1966); LePage's, 324 F.3d at 157. A prerequisite for such a violation is a finding that monopoly power exists. See, e.g., LePage's, 324 F.3d at 146. In addition, the exclusionary conduct must have an anti-competitive effect. See id. at 152, 159-63. If those elements are established, the monopolist still retains a defense of business justification. See id. at 152.

Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. United States v. Microsoft, 253 F.3d 34, 79 (D.C. Cir. 2001); 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 651c at 78 (1996). Predatory or exclusionary practices in themselves are not sufficient. There

10

must be proof that competition, not merely competitors, has been harmed.  LePage's, 324 F.3d at 162.

## III. MONOPOLY POWER

The concept of monopoly is distinct from monopoly power, which has been defined as the ability "to control prices or exclude competition."  Grinnell, 384 U.S. at 571; see also United States v. E.I. du Pont de Nemours and Co., 351 U.S. 377 (1956).  However, because such evidence is "only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power."  Microsoft, 253 F.3d at 51.  Thus, the existence of monopoly power may be inferred from a predominant share of the market, Grinnell, 384 U.S. at 571, and the size of that portion is a primary factor in determining whether power exists.  Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pa, 745 F.2d 248, 260 (3d Cir. 1984).

A less than predominant share of the market combined with other relevant factors may suffice to demonstrate monopoly power.  Fineman v. Armstrong World Indus., 980 F.2d 171, 201 (3d Cir. 1992).  Absent other pertinent factors, a share significantly larger than 55% has been required to established prima facie market power.  Id. at 201.  Other germane factors include the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand.  See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961); Barr Labs. v. Abbott Labs., 978 F.2d 98 (3d Cir.

11

1992); Weiss v. York Hosp., 745 F.2d 786, 827 n.72 (3d Cir. 1984).

## A.  The Relevant Market

Defining the relevant market is an important part of the analysis.  The District Court found the market to be "the sale of prefabricated artificial teeth in the United States."  United States v. Dentsply Int'l Inc., 277 F. Supp 2d. 387, 396 (D. Del. 2003).  Further, the Court found that "[t]he manufacturers participating in the United States artificial tooth market historically have distributed their teeth into the market in one of three ways: (1) directly to dental labs; (2) through dental dealers; or (3) through a hybrid system combining manufacturer direct sales and dental dealers."  Finding of Fact  13.[1]  The Court also found that the "labs are the relevant consumers for prefabricated artificial teeth."  FF61.

There is no dispute that the laboratories are the ultimate consumers because they buy the teeth at the point in the process where they are incorporated into another product.  Dentsply points out that its representatives concentrate their efforts at the laboratories as well as at dental schools and dentists.  See Dentsply Int'l Inc., 277 F. Supp 2d. at 429-34.

During oral argument, Dentsply's counsel said, "the dealers are not the market...[t]he market is the dental labs that

---

[1] The District Court's Findings of Fact will be referred to as "FF" hereafter.

consume the product."  Transcript of Oral Argument at 47. Emphasizing the importance of end users, Dentsply argues that the District Court understood the relevant market to be the sales of artificial teeth to dental laboratories in the United States. Although the Court used the word "market" in a number of differing contexts, the findings demonstrate that the relevant market is not as narrow as Dentsply would have it.  In FF238, the Court said that Dentsply "has had a persistently high market share between 75% and 80% on a revenue basis, in the artificial tooth market."  Dentsply sells only to dealers and the narrow definition of market that it urges upon us would be completely inconsistent with that finding of the District Court.

The Court went on to find that Ivoclar "has the second-highest share of the market, at approximately 5%."  FF239. Ivoclar sells directly to the laboratories.  Therefore, these two findings establish that the relevant market in this case includes sales to dealers and direct sales to the laboratories.  Other findings on Dentsply's "market share" are consistent with this understanding.  FF240-243.

These findings are persuasive that the District Court understood, as do we, the relevant market to be the total sales of artificial teeth to the laboratories and the dealers combined.

Dentsply's apparent belief that a relevant market cannot include sales both to the final consumer and a middleman is refuted in the closely analogous case of <u>Allen-Myland, Inc. v. IBM Corp.</u>, 33 F.3d 194 (3d Cir. 1994).  In that case, IBM sold mainframe computers directly to the ultimate consumers and also sold to companies that leased computers to ultimate users.

13

We concluded that the relevant market encompassed the sales directly to consumers as well as those to leasing companies. "...to the extent that leasing companies deal in used, non-IBM mainframes that have not already been counted in the sales market, these machines belong in the relevant market for large-scale mainframe computers." <u>Id.</u> at 203.

To resolve any doubt, therefore, we hold that the relevant market here is the sale of artificial teeth in the United States both to laboratories and to the dental dealers.

<u>B.  Power to Exclude</u>

Dentsply's share of the market is more than adequate to establish a prima facie case of power.  In addition, Dentsply has held its dominant share for more than ten years and has fought aggressively to maintain that imbalance.   One court has commented that, "[i]n evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share."  <u>United States v. Syufy Enters.</u>, 903 F.2d 659, 665-66 (9th Cir. 1990).

The District Court found that it could infer monopoly power because of the predominant market share, but despite that factor, concluded that Dentsply's tactics did not preclude competition from marketing their products directly to the dental laboratories.  "Dentsply does not have the power to exclude competitors from the ultimate consumer."  <u>United States v. Dentsply Int'l, Inc.</u>, 277 F. Supp. 2d 387, 452 (D. Del. 2003).

14

Moreover, the Court determined that failure of Dentsply's two main rivals, Vident and Ivoclar, to obtain significant market shares resulted from their own business decisions to concentrate on other product lines, rather than implement active sales efforts for teeth.

The District Court's evaluation of Ivoclar and Vident business practices as a cause of their failure to secure more of the market is not persuasive. The reality is that over a period of years, because of Dentsply's domination of dealers, direct sales have not been a practical alternative for most manufacturers. It has not been so much the competitors' less than enthusiastic efforts at competition that produced paltry results, as it is the blocking of access to the key dealers. This is the part of the real market that is denied to the rivals.

The apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy. Although its rivals could theoretically convince a dealer to buy their products and drop Dentsply's line, that has not occurred. In <u>United States v. Visa U.S.A.</u>, 344 F.3d at 229, 240 (2d Cir. 2003), the Court of Appeals held that similar evidence indicated that defendants had excluded their rivals from the marketplace and thus demonstrated monopoly power.

The Supreme Court on more than one occasion has emphasized that economic realities rather than a formalistic approach must govern review of antitrust activity. "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law

15

. . . in determining the existence of market power . . . this Court has examined closely the economic reality of the market at issue." <u>Eastern Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 457, 466-67 (1992). "If we look at substance rather than form, there is little room for debate." <u>United States v. Sealy, Inc.</u>, 388 U.S. 350, 352 (1967). We echoed that standard in <u>Weiss v. York Hosp.</u>, 745 F.2d 786, 815 (3d Cir. 1984). "Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form." <u>Id</u>.

The realities of the artificial tooth market were candidly expressed by two former managerial employees of Dentsply when they explained their rules of engagement. One testified that Dealer Criterion 6 was designed to "block competitive distribution points." He continued, "Do not allow competition to achieve toeholds in dealers; tie up dealers; do not 'free up' key players."

Another former manager said:

You don't want your competition with your distributors, you don't want to give the distributors an opportunity to sell a competitive product. And you don't want to give your end user, the customer, meaning a laboratory and/or a dentist, a choice. He has to buy Dentsply teeth. That's the only thing that's available. The only place you can get it is through the distributor and the only one that the distributor is selling is Dentsply teeth. That's your objective.

16

These are clear expressions of a plan to maintain monopolistic power.

The District Court detailed some ten separate incidents in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth. For example, when the DLDS firm considered adding two other tooth lines because of customers' demand, Dentsply threatened to sever access not only to its teeth, but to other dental products as well. DLDS yielded to that pressure. The termination of Trinity Dental, which had previously sold Dentsply products other than teeth, was a similar instance. When Trinity wanted to add teeth to its line for the first time and chose a competitor, Dentsply refused to supply other dental products.

Dentsply also pressured Atlanta Dental, Marcus Dental, Thompson Dental, Patterson Dental and Pearson Dental Supply when they carried or considered adding competitive lines. In another incident, Dentsply recognized DTS as a dealer so as to "fully eliminate the competitive threat that [DTS locations] pose by representing Vita and Ivoclar in three of four regions."

The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market.

In concluding that Dentsply lacked the power to exclude competitors from the laboratories, "the ultimate consumers," the District Court overlooked the point that the relevant market was

17

the "sale" of artificial teeth to both dealers and laboratories. Although some sales were made by manufacturers to the laboratories, overwhelming numbers were made to dealers. Thus, the Court's scrutiny should have been applied not to the "ultimate consumers" who used the teeth, but to the "customers" who purchased the teeth, the relevant category which included dealers as well as laboratories. This mis-focus led the District Court into clear error.

The factual pattern here is quite similar to that in LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003). There, a manufacturer of transparent tape locked up high volume distribution channels by means of substantial discounts on a range of its other products. LePage's, 324 F.3d at 144, 160-62. We concluded that the use of exclusive dealing and bundled rebates to the detriment of the rival manufacturer violated Section 2. See LePage's, 324 F.3d at 159. Similarly, in Microsoft, the Court of Appeals for the D. C. Circuit concluded that, through the use of exclusive contracts with key dealers, a manufacturer foreclosed competitors from a substantial percentage of the available opportunities for product distribution. See Microsoft, 253 F.3d at 70-71.

The evidence in this case demonstrates that for a considerable time, through the use of Dealer Criterion 6 Dentsply has been able to exclude competitors from the dealers' network, a narrow, but heavily traveled channel to the dental laboratories.

18

C.  Pricing

An increase in pricing is another factor used in evaluating existence of market power.  Although in this case the evidence of exclusion is stronger than that of Dentsply's control of prices, testimony about suspect pricing is also found in this record.

The District Court found that Dentsply had a reputation for aggressive price increases in the market.  It is noteworthy that experts for both parties testified that were Dealer Criterion 6 abolished, prices would fall.  A former sales manager for Dentsply agreed that the company's share of the market would diminish should Dealer Criterion 6 no longer be in effect.  In 1993, Dentsply's regional sales manager complained, "[w]e need to moderate our increases – twice a year for the last few years was not good."  Large scale distributors observed that Dentsply's policy created a high price umbrella.

Although Dentsply's prices fall between those of Ivoclar and Vita's premium tooth lines, Dentsply did not reduce its prices when competitors elected not to follow its increases. Dentsply's profit margins have been growing over the years. The picture is one of a manufacturer that sets prices with little concern for its competitors, "something a firm without a monopoly would have been unable to do." Microsoft, 253 F.3d at 58.  The results have been favorable to Dentsply, but of no benefit to consumers.

Moreover, even "if monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract [a monopoly price] provides no

19

succor to the monopolist." <u>Microsoft</u>, 253 F.3d at 57 (quoting <u>Berkey Photo, Inc. v. Eastman Kodak, Co.</u>, 603 F.2d 263, 274 (2d Cir. 1979)). The record of long duration of the exclusionary tactics and anecdotal evidence of their efficacy make it clear that power existed and was used effectively. The District Court erred in concluding that Dentsply lacked market power.

## IV. ANTI-COMPETITIVE EFFECTS

Having demonstrated that Dentsply possessed market power, the Government must also establish the second element of a Section 2 claim, that the power was used "to foreclose competition." <u>United States v. Griffith</u>, 334 U.S. 100, 107 (1948). Assessing anti-competitive effect is important in evaluating a challenge to a violation of Section 2. Under that Section of the Sherman Act, it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit. <u>LePage's</u>, 324 F.3d at 159-60; <u>Microsoft</u>, 253 F.3d at 69.

A leading treatise explains,

A set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth. Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1802c, at 64 (2d ed. 2002).

20

By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly. It helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition. See LePage's, 324 F.3d 141, 159 (3d Cir. 2001) ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.").

A.  Benefits of Dealers

Dentsply has always sold its teeth through dealers. Vita sells through Vident, its exclusive distributor and domestic affiliate, but has a mere 3% of the market. Ivoclar had some relationship with dealers in the past, but its direct relationship with laboratories yields only a 5% share.

A number of factors are at work here. For a great number of dental laboratories, the dealer is the preferred source for artificial teeth. Although the District Court observed that "labs prefer to buy direct because of potential cost savings attributable to the elimination of the dealer middleman[,]" FF81, in fact, laboratories are driven by the realities of the marketplace to buy far more heavily from dealers than manufacturers. This may be largely attributed to the beneficial services, credit function, economies of scale and convenience that dealers provide to

21

laboratories, benefits which are otherwise unavailable to them when they buy direct.  FF71, 81, 84.

The record is replete with evidence of benefits provided by dealers.  For example, they provide laboratories the benefit of "one stop-shopping" and extensive credit services.  Because dealers typically carry the products of multiple manufacturers, a laboratory can order, with a single phone call to a dealer, products from multiple sources.  Without dealers, in most instances laboratories would have to place individual calls to each manufacturer, expend the time, and pay multiple shipping charges to fill the same orders.

The dealer-provided reduction in transaction costs and time represents a substantial benefit, one that the District Court minimized when it characterized "one stop shopping" as merely the ability to order from a single manufacturer all the materials necessary for crown, bridge and denture construction.  FF84.  Although a laboratory can call a manufacturer directly and purchase any product made by it, FF84, the laboratory is unable to procure from that source products made by its competitors.  Thus, purchasing through dealers, which as a class traditionally carries the products of multiple vendors, surmounts this shortcoming, as well as offers other advantages.

Buying through dealers also enables laboratories to take advantage of obtaining discounts.  Because they engage in price competition to gain laboratories' business, dealers often discount manufacturers' suggested laboratory price for artificial teeth.  FF69, 70.  There is no finding on this record that manufacturers offer similar discounts.

22

Another service dealers perform is taking back tooth returns. Artificial teeth and denture returns are quite common in dentistry. Approximately 30% of all laboratory tooth purchases are returned for exchange or credit. FF97. The District Court disregarded this benefit on the ground that all manufacturers except Vita accept tooth returns. FF97. However, in equating dealer and manufacturer returns, the District Court overlooked the fact that using dealers, rather than manufacturers, enables laboratories to consolidate their returns. In a single shipment to a dealer, a laboratory can return the products of a number of manufacturers, and so economize on shipping, time, and transaction costs.

Conversely, when returning products directly to manufacturers, a laboratory must ship each vendor's product separately and must track each exchange individually. Consolidating returns yields savings of time, effort, and costs.

Dealers also provide benefits to manufacturers, perhaps the most obvious of which is efficiency of scale. Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks. Dentsply, for example, currently sells to twenty three dealers. If it were instead to sell directly to individual laboratories, Dentsply would incur significantly higher transaction costs, extension of credit burdens, and credit risks.

Although a laboratory that buys directly from a manufacturer may be able to avoid the marginal costs associated

23

with "middleman" dealers, any savings must be weighed against the benefits, savings, and convenience offered by dealers.

In addition, dealers provide manufacturers more marketplace exposure and sales representative coverage than manufacturers are able to generate on their own. Increased exposure and sales coverage traditionally lead to greater sales.

B. "Viability" of Direct Sales

The benefits that dealers provide manufacturers help make dealers the preferred distribution channels – in effect, the "gateways" – to the artificial teeth market. Nonetheless, the District Court found that selling direct is a "viable" method of distributing artificial teeth. FF71, 73, 74-81, CL26. But we are convinced that it is "viable" only in the sense that it is "possible," not that it is practical or feasible in the market as it exists and functions. The District Court's conclusion of "viability" runs counter to the facts and is clearly erroneous. On the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed." <u>United States v. Igbonwa</u>, 120 F.3d 437, 440 (3d Cir. 1997) (citations and internal quotations omitted).

It is true that Dentsply's competitors can sell directly to the dental laboratories and an insignificant number do. The undeniable reality, however, is that dealers have a controlling degree of access to the laboratories. The long-entrenched Dentsply dealer network with its ties to the laboratories makes it impracticable for a manufacturer to rely on direct distribution

24

to the laboratories in any significant amount.  See United States v. Visa U.S.A., 344 F.3d 229, 240 (2d Cir. 2003).

That some manufacturers resort to direct sales and are even able to stay in business by selling directly is insufficient proof that direct selling is an effective means of competition. The proper inquiry is not whether direct sales enable a competitor to "survive" but rather whether direct selling "poses a real threat" to defendant's monopoly. See Microsoft, 253 F.3d at 71.  The minuscule 5% and 3% market shares eked out by direct-selling manufacturers Ivoclar and Vita, Dentsply's "primary competitors," FF26, 36, 239, reveal that direct selling poses little threat to Dentsply.

## C.  Efficacy of Dealer Criterion 6

Although the parties to the sales transactions consider the exclusionary arrangements to be agreements, they are technically only a series of independent sales.  Dentsply sells teeth to the dealers on an individual transaction basis and essentially the arrangement is "at-will."  Nevertheless, the economic elements involved – the large share of the market held by Dentsply and its conduct excluding competing manufacturers – realistically make the arrangements here as effective as those in written contracts.  See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 n.9 (1984).

Given the circumstances present in this case, there is no ground to doubt the effectiveness of the exclusive dealing arrangement.  In LePage's, 324 F.3d at 162, we concluded that 3M's aggressive rebate program damaged LePage's ability to

25

compete and thereby harmed competition itself. LePage's simply could not match the discounts that 3M provided. LePage's, 324 F.3d at 161. Similarly, in this case, in spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth. Dealer Criterion 6 is not edentulous.[2]

## D.  Limitation of Choice

An additional anti-competitive effect is seen in the exclusionary practice here that limits the choices of products open to dental laboratories, the ultimate users. A dealer locked into the Dentsply line is unable to heed a request for a different manufacturers' product and, from the standpoint of convenience, that inability to some extent impairs the laboratory's choice in the marketplace.

---

[2] In some cases which we find distinguishable, courts have indicated that exclusive dealing contracts of short duration are not violations of the antitrust laws. See, e.g., CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999) ("distributors" only provided sales leads and sales increased after competitor imposed exclusive dealing arrangements); Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997) (manufacturer with 55% market share sold both to consumers and distributors, market showed decreasing prices and fluctuating shares); Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215 (8th Cir. 1987) (manufacturer sold its products through both direct sales and distributors); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380 (7th Cir. 1984) (contract between dealer and manufacturer did not contain exclusive dealing provision).

As an example, current and potential customers requested Atlanta Dental to carry Vita teeth. Although these customers could have ordered the Vita teeth from Vident in California, Atlanta Dental's tooth department manager believed that they were interested in a local source. Atlanta Dental chose not to add the Vita line after being advised that doing so would cut off access to Dentsply teeth, which constituted over 90% of its tooth sales revenue.

Similarly, DLDS added Universal and Vita teeth to meet customers' requests, but dropped them after Dentsply threatened to stop supplying its product. Marcus Dental began selling another brand of teeth at one point because of customer demand in response to supply problems with Dentsply. After Dentsply threatened to enforce Dealer Criterion 6, Marcus dropped the other line.

## E.  Barriers to Entry

Entrants into the marketplace must confront Dentsply's power over the dealers. The District Court's theory that any new or existing manufacturer may "steal" a Dentsply dealer by offering a superior product at a lower price, see Omega Environmental, Inc. v. Gilbarco, 127 F.3d 1157 (9th Cir. 1997), simply has not proved to be realistic. To the contrary, purloining efforts have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions. The paltry penetration in the market by competitors over the years has been a refutation of theory by tangible and measurable results in the real world.

27

The levels of sales that competitors could project in wooing dealers were minuscule compared to Dentsply's, whose long-standing relationships with these dealers included sales of other dental products. For example, Dentsply threatened Zahn with termination if it started selling Ivoclar teeth. At the time, Ivoclar's projected $1.2 million in sales were 85% lower than Zahn's $8 million in Dentsply's sales.

When approached by Leach & Dillon and Heraeus Kulzer, Zahn's sales of Dentsply teeth had increased to $22-$23 million per year. In comparison, the president of Zahn expected that Leach & Dillon would add up to $200,000 (or less than 1% of its Dentsply's sales) and Heraeus Kulzer would contribute "maybe hundreds of thousands." Similarly, Vident's $1 million in projected sales amounted to 5.5% of its $18 million in annual Dentsply's sales.

The dominant position of Dentsply dealers as a gateway to the laboratories was confirmed by potential entrants to the market. The president of Ivoclar testified that his company was unsuccessful in its approach to the two large national dealers and other regional dealers. He pointed out that it is more efficient to sell through dealers and, in addition, they offered an entre to future customers by promotions in the dental schools.

Further evidence was provided by a Vident executive, who testified about failed attempts to distribute teeth through ten identified dealers. He attributed the lack of success to their fear of losing the right to sell Dentsply teeth.

28

Another witness, the president of Dillon Company, advised Davis, Schottlander & Davis, a tooth manufacturer, "to go through the dealer network because anything else is futile...[D]ealers control the tooth industry. If you don't have distribution with the dealer network, you don't have distribution." Some idea of the comparative size of the dealer network was illustrated by the Dillon testimony: "Zahn does $2 billion, I do a million-seven. Patterson does over a billion dollars, I do a million-seven. I have ten employees, they have 6,000."

Dealer Criterion 6 created a strong economic incentive for dealers to reject competing lines in favor of Dentsply's teeth. As in LePage's, the rivals simply could not provide dealers with a comparable economic incentive to switch. Moreover, the record demonstrates that Dentsply added Darby as a dealer "to block Vita from a key competitive distribution point." According to a Dentsply executive, the "key issue" was "Vita's potential distribution system." He explained that Vita was "having a tough time getting teeth out to customers. One of their key weaknesses is their distribution system."

Teeth are an important part of a denture, but they are but one component. The dealers are dependent on serving all of the laboratories' needs and must carry as many components as practicable. The artificial teeth business cannot realistically be evaluated in isolation from the rest of the dental fabrication industry.

A leading treatise provides a helpful analogy to this situation:

29

[S]uppose that mens's bow ties cannot efficiently be sold in stores that deal exclusively in bow ties* or even ties generally; rather, they must be sold in department stores where clerks can spread their efforts over numerous products and the ties can be sold in conjunction with shirts and suits. Suppose further that a dominant bow tie manufacturer should impose exclusive dealing on a town's only three department stores. In this case the rival bow tie maker cannot easily enter. Setting up another department store is an unneeded and a very large investment in proportion to its own production, which we assume is only bow ties, but any store that offers less will be an inefficient and costly seller of bow ties. As a result, such exclusive dealing could either exclude the nondominant bow tie maker or else raise its costs in comparison to the costs of the dominant firm. While the department stores might prefer to sell the ties of multiple manufacturers, if faced with an "all-or-nothing" choice they may accede to the dominant firm's wish for exclusive dealing. Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1802e3, at 78-79 (2d ed. 2002).

* The authors do not disclose whether the bow ties are blue polka-dot patterns or other designs.

Criterion 6 imposes an "all-or-nothing" choice on the dealers. The fact that dealers have chosen not to drop Dentsply

teeth in favor of a rival's brand demonstrates that they have acceded to heavy economic pressure.

This case does not involve a dynamic, volatile market like that in <u>Microsoft</u>, 253 F.3d at 70, or a proven alternative distribution channel. The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market. The economic impact of an exclusive dealing arrangement is amplified in the stagnant, no growth context of the artificial tooth field.

Dentsply's authorized dealers are analogous to the high volume retailers at issue in <u>LePage's</u>. Although the dealers are distributors and the stores in <u>LePage's</u>, such as K-Mart and Staples, are retailers, this is a distinction in name without a substantive difference. <u>LePage's</u>, 324 F.3d at 144. Selling to a few prominent retailers provided "substantially reduced distribution costs" and "cheap, high volume supply lines." <u>Id</u>. at 160 n.14. The manufacturer sold to a few high volume businesses and benefitted from the widespread locations and strong customer goodwill that prominent retailers provided as opposed to selling directly to end-user consumers or to a multitude of smaller retailers. There are other ways across the "river" to consumers, but high volume retailers provided the most effective bridge.

The same is true here. The dealers provide the same advantages to Dentsply, widespread locations and long-standing relationships with dental labs, that the high volume retailers provided to 3M. Even orders that are drop-shipped directly from Dentsply to a dental lab originate through the dealers. This

31

underscores that Dentsply's dealers provide a critical link to end-users.

Although the District Court attributed some of the lack of competition to Ivoclar's and Vident's bad business decisions, that weakness was not ascribed to other manufacturers. Logically, Dealer Criterion 6 cannot be both a cause of the competitors' lower promotional expenditures which hurt their market positions, and at the same time, be unrelated to their exclusion from the marketplace. Moreover, in <u>Microsoft</u>, in spite of the competitors' self-imposed problems, the Court of Appeals held that Microsoft possessed monopoly power because it benefitted from a significant barrier to entry. <u>Microsoft</u>, 253 F.3d at 55.

Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors. The District Court erred when it minimized that situation and focused on a theoretical feasibility of success through direct access to the dental labs. While we may assume that Dentsply won its preeminent position by fair competition, that fact does not permit maintenance of its monopoly by unfair practices. We conclude that on this record, the Government established that Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated Section 2.

## V. BUSINESS JUSTIFICATION

As noted earlier, even if a company exerts monopoly power, it may defend its practices by establishing a business justification. The Government, having demonstrated harm to

32

competition, the burden shifts to Dentsply to show that Dealer Criterion 6 promotes a sufficiently pro-competitive objective. United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993). Significantly, Dentsply has not done so. The District Court found that "Dentsply's asserted justifications for its exclusionary policies are inconsistent with its announced reason for the exclusionary policies, its conduct enforcing the policy, its rival suppliers' actions, and dealers' behavior in the marketplace." FF356.

Some of the dealers opposed Dentsply's policy as exerting too much control over the products they may sell, but the grandfathered dealers were no less efficient than the exclusive ones, nor was there any difference in promotional support. Nor was there any evidence of existence of any substantial variation in the level of service provided by exclusive and grandfathered dealers to the laboratories.

The record amply supports the District Court's conclusion that Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices.

## VI.  AVAILABILITY OF
## SHERMAN ACT SECTION 2 RELIEF

One point remains. Relying on *dicta* in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961), the District Court said that because it had found no liability under the stricter standards of Section 3 of the Clayton Act, it followed that there was no violation of Section 2 of the Sherman Act. However, as we explained in LePage's v. 3M, 324 F.3d at 157

n.10, a finding in favor of the defendant under Section 1 of the Sherman Act and Section 3 of the Clayton Act, did not "preclude the application of evidence of . . . exclusive dealing to support the [Section] 2 claim." All of the evidence in the record here applies to the Section 2 claim and, as in LePage's, a finding of liability under Section 2 supports a judgment against defendant.

We pointed out in Allegheny County Sanitary Authority v. EPA, 732 F.2d 1167, 1172-73 (3d Cir. 1984), that different theories may be presented to establish a cause of action. A court's refusal to accept one theory rather than another neither undermines the claim as a whole, nor the judgment applying one of the theories. Here, the Government can obtain all the relief to which it is entitled under Section 2 and has chosen to follow that path without reference to Section 1 of the Sherman Act or Section 3 of the Clayton Act. We find no obstacle to that procedure.

Accordingly, for the reasons set forth above, we will reverse the judgment in favor of Dentsply and remand the case to the District Court with directions to grant injunctive relief requested by the Government and for such other proceedings as are consistent with this opinion.

_____

34